**DRINKER BIDDLE & REATH LLP**
A Delaware Limited Liability Partnership
500 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 360-1100
Facsimile: (973) 360-9831

Attorneys for Defendant
FUJIFILM U.S.A., Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TOBI WHITE, | Case No.  06 CV 13769 (SCR) |
| Plaintiff, | |
| v. | **DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1** |
| FUJI PHOTO FILM USA, INC., | |
| Defendant. | |

Defendant FUJIFILM U.S.A., Inc. ("FUSA") submits this Statement of Undisputed

Material Facts Pursuant to Local Rule 56.1 in Support of its Motion for Summary Judgment.

1.   FUSA is in the business of marketing and distributing products, technology and

services relating to the digital photographic and photofinishing industry.   The Company's

corporate headquarters is in Valhalla, New York.  [Declaration of Sharon Giorlando, dated

October 1, 2009 ("Giorlando Decl."), ¶ 1].[1]

---

[1] Plaintiff, during her employment with FUSA, interacted with Sharon Virgulak (then Director of Employee Relations).   Ms. Virgulak's name has since changed to Sharon Giorlando. Although certain record evidence makes reference to "Sharon Virgulak" (since those documents pre-dated the name change), for purposes of this motion, FUSA will refer only to "Ms. Giorlando" since this is the name used for Ms. Giorlando's deposition and the enclosed Declaration.  FUSA acknowledges, however, that any reference to "Sharon Virgulak" applies to "Sharon Giorlando".

*The following facts are not in dispute because they were litigated and decided in the case White v. Fuji Photo Film U.S.A., Inc., 434 F. Supp. 2d 144 (S.D.N.Y. 2006).*

**A.     Plaintiff's Poor Performance From April 2002 to September 2004.**

2.     FUSA hired Plaintiff as an administrative secretary in the Quicksnap Department on October 9, 2001. [Declaration of Helen E. Tuttle, dated October 2, 2009 ("Tuttle Decl."), Ex. A, White Dep. Vol. I, 43:13-16; 44:2-4; 54:18-23].

3.     Several months later, in April 2002, as part of a company-wide reorganization, FUSA reassigned Plaintiff to the Marketing Department, where she reported to Susan Schaffer ("Schaffer"). [*Id.*, White Dep. Vol. I, 45:6-8; 59:5-14; 62:25 to 63:5].

4.     Plaintiff's title changed to Office Assistant as a result of information Plaintiff provided to an outside consultant several months prior. [*Id.*, White Dep. Vol. I, 46:7-13; 47:25 to 48:12; 48:25 to 50:14].

5.     Plaintiff considered this the same level position and there was no change in her salary or grade. [*Id.*, White Dep. Vol. I, 46:14-20; 46:25 to 47:2; 48:19-21; 51:25 to 52:2].

6.     According to Plaintiff, this reassignment to the Marketing Department was a positive move for her. [*Id.*, White Dep. Vol. I, 63:25 to 64:5].

**(1)     Plaintiff is Unable to Meet the Increased Demands of Her Job in the Marketing Department.**

7.     The Marketing Department was, at times, fast paced and chaotic. [*Id.*, White Dep. Vol. I, 126:24 to 127:5; Ex. B, Schaffer Dep., 18:13-17].

8.     Plaintiff admitted that it was busier than her prior department. [*Id.*, Ex. A, White Dep. Vol. I, 63:21-24].

9.    Plaintiff's job duties included, among other things, answering phones, taking messages, preparing memos, filing, assisting with product samples and monthly reports. Plaintiff supported four product managers and an intern in addition to Ms. Schaffer. [*Id.*, Ex. A, White Dep. Vol. I, 45:9-17; Ex. B, Schaffer Dep., 9:13-19; 17:14-21].

10.    Plaintiff became frustrated by the very fast pace of the department. [*Id.*, Ex. B, Schaffer Dep., 18:12-13].

11.    Plaintiff repeatedly told Ms. Schaffer that it would be much "easier" for her (Plaintiff) to perform her job if the managers would better plan "rush" projects and requests. [*Id.*, Ex. B, Schaffer Dep., 18:17-21].

12.    Plaintiff's request that managers plan "rush" projects was often not possible because of business needs (*i.e.*, market changes, the sales group, or the customers). [*Id.*, Schaffer Dep., 18:22 to 19:2].

13.    From the start, Ms. Schaffer raised performance issues with Plaintiff. [*Id.*, Ex. A, White Dep. Vol. I, 69:15-18].

14.    Plaintiff failed to fulfill simple requests such as timely filing, date-stamping incoming mail with a "received" date, and taking complete phone messages including phone numbers, names and other relevant information. [*Id.*, Ex. B, Schaffer Dep., 17:2-6; 19:5-11].

15.    Plaintiff also appeared frustrated with manager requests, would not complete them, and then failed to inform Ms. Schaffer (or the appropriate manager) that the assigned task was incomplete. [*Id.*, Schaffer Dep., 19:17-24].

16.    Ms. Schaffer continually discussed with Plaintiff aspects of her performance that needed improvement. [*Id.*, Schaffer Dep., 16:9-13, 17-22].

**(2)     Plaintiff is Placed on a PIP and Probation, Then Successfully Completes Program.**

17.     In 2003, Ms. Schaffer continued to meet with Plaintiff regarding her performance. [Tuttle Decl., Ex. A, White Dep. Vol. I, 100:3-9].

18.     Plaintiff was placed on formal warning for the period from December 5, 2003 to January 5, 2004, later extended until January 30, 2004 because of the holidays.  [*Id.*, Ex. A, White Dep. Vol. I, 134:10 to 135:4; 139:2-5; 139:22 to 140:10; Ex. B, Schaffer Dep., 30:11 to 31:6].

19.     In Plaintiff's Performance Improvement Plan ("PIP"), Ms. Schaffer outlined Plaintiff's responsibilities and worked with her to achieve that plan.  [*Id.*, Ex. B, Schaffer Dep., 42:9-14].

20.     Plaintiff conceded that most of the objectives listed in the PIP were reasonable. [*Id.*, Ex. A, White Dep. Vol. I, 135:9-24].

21.     Plaintiff was placed on a second 30-day probationary period, effective February 16th to March 16th, 2004.  [*Id.*, Ex. A, White Dep. Vol. I, 157:17-22].

22.     Plaintiff successfully completed her objectives during her second 30-day probationary period and was removed from probation.  [*Id.*, Ex. B, Schaffer Dep., 44:13-20; Ex. C, White Dep. Vol. II, 217:13-24, 252:8-21].

*The following facts are not in dispute based on the record evidence.*

**B.   Plaintiff's Inconsistent Performance Continues While Reporting to A Different Manager.**

23.   In September 2004, in connection with another company-wide reorganization, FUSA reassigned Plaintiff to a new department, the Digital Devices Division. [Tuttle Decl., Ex. C, White Dep. Vol. II, 271:14-20; 273:20-25].

24.   Plaintiff reported to William Drysdale, Vice President of Marketing. [*Id.*, Ex. C, White Dep. Vol. II, 271:10-13; Ex. D, Drysdale Dep., 20:14-15].

25.   Plaintiff provided administrative support to other department managers. [*Id.*, Ex. C, White Dep. Vol. II, 274:19 to 275:8; 276:11-17; 278:11-14].

26.   Plaintiff's title remained Office Assistant. [*Id.*, White Dep. Vol. II, 274:2-5].

27.   Plaintiff had a good working relationship with Mr. Drysdale and her department managers. [*Id.*, White Dep. Vol. II, 272:11-13; 276:18-21; 277:8-14].


**(1)   September 29, 2004 Meeting with Plaintiff and Mr. Drysdale.**

28.   Mr. Drysdale met with Plaintiff on September 29, 2004 to discuss Plaintiff's job responsibilities and his expectations. [Tuttle Decl., White Dep. Vol. II, 277:15 to 278:20; 280:14-25].

29.   Sharon Giorlando, Director of Employee Relations, attended this September 29th meeting with Plaintiff and Mr. Drysdale. [*Id.*, White Dep. Vol. II, 277:15-19].

30.   Plaintiff's responsibilities included computer support, filing, copying, phone support, contacting internal and external customers and vendors, processing change order for samples, and shipping of presentations and products. [Tuttle Decl., Ex. D, Drysdale's Dep., 29:17 to 30:6].

31. Mr. Drysdale memorialized the September 29th meeting in a memorandum, dated September 30, 2004, which Plaintiff received. [*Id.*, White Dep. Vol. II, 280:10-15; Ex. E, Memorandum dated September 30, 2004 ("September 30th Memorandum")].

32. Exhibit E is a true and correct copy of the September 30th Memorandum and states, in part:

- o   We met on September 29, 2004 to establish parameters and set expectations for your position as Office Assistant within the Digital Devices Division.

- o   We all agreed that this new division, management team, and structure would provide you with a fresh start within Fujifilm. You have the opportunity to move forward with a clean slate and establish yourself with a new group of Fujifilm managers.

- o   While this memo will not serve as your job description, we discussed several areas in which you will be supporting the new marketing team, including:
  - ▪ Phones, meeting arrangements and preparation; travel arrangements, itinerary and schedule management; attendance management; computer support (Word, Powerpoint, Excel); data management; filing; tracking and reporting; and special projects as needed.

  - ▪ In addition, you will have communication and be the face of Fujifilm with several internal and external constituents, including Fujifilm sales teams, other Fujifilm product ad support groups, external vendors, suppliers, and Fujifilm customers.

- o   Initially, administrative support will be broken down as follows, with expectations that all administrative personnel contribute and work together to meet the overall needs of the division:
  - ▪ Tobi White (6):  Bill Drysdale, Ron Gazzola, David Troy, Jennifer Davalos, Product Manager TBD (Flash Memory and Accessories), and Associate Product Manager TBD.

- Toni Ford (1+): Magaly Jager (Toni is current temporary employee and will support Magaly and Photo Capture Division Category Management team).

- Enza Materia (6): Eric Thorng, Darin Pepple, John Loira, in addition to sales management Steve Cordova, Tony Sorice, Al Day.

[Tuttle Decl., Ex. E, September 30th Memorandum].

### (2)   Manager Complaints Pre-Dated Plaintiff's Filing Of Her First Lawsuit.

33.   Mr. Drysdale discussed Plaintiff's job performance with her as he did with any other employee. [Tuttle Decl., Ex. D, Drysdale Dep., 32:17-25].

34.   Mr. Drysdale brought errors, mistakes, or concerns to Plaintiff's attention and attempted to fix them to improve the performance of Plaintiff and the department as a whole. [*Id.*, Drysdale Dep., 32:17-22].

35.   Mr. Drysdale recalled specific performance problems such as lack of follow-up and lack of responsiveness and communication. [*Id.*, Drysdale Dep., 33:2 to 35:10].

36.   Mr. Drysdale recalled asking Plaintiff to set-up a group-wide distribution email list for his department. [*Id.*, Drysdale Dep., 33:21-23].

37.   Mr. Drysdale gave Plaintiff the email list multiple times and had to follow-up several times before the task was completed. [*Id.*, Drysdale Dep., 33:21 to 34:8].

38.   Mr. Drysdale followed up with Plaintiff regarding her processing of sample orders for other FUSA employees. [*Id.*, Drysdale Dep., 34:18 to 35:6].

39.   Plaintiff agrees that department manager complaints pre-dated the filing of her First Lawsuit. [Tuttle Decl., Ex. C, White Dep. Vol. II, 340:22-25].

40.    Ron Gazzola wrote in a **February 24, 2005** email:

> Bill, as you and I previously discussed, I have asked Melanie, Dave, and Jennifer to funnel any admin type work directly to Tobi. With all of the projects they are involved in, my team really needs to be able to rely on Tobi to turn these requests around in a timely and accurate manner. I can't have us worry about requests 'fading away' with no feedback or follow-up, that's the whole point is [sic] asking for Tobi's help. Please see the email string from Melanie. Melanie sent the request on the afternoon of the 17th. Today, 2-24, Melanie left a hard copy of the email she sent on 2-17 on Tobi's desk as a reminder. Basically, nothing was done while we were at PMA. Tobi should have had plenty of time to work on these simple requests or should have called Melanie's cell phone during PMA if she had questions on what to do. Sorry to keep at you with this, put [sic] we don't want the product managers compensating for our admin. Thanks, Ron G.

[Declaration of William Drysdale, dated September 30, 2009, ("Drysdale Decl."), Ex. A, Email to Drysdale from Gazzola, dated February 24, 2005].

41.    Melanie McNichol, Associate Product Manager, wrote the following to Plaintiff, **on January 21, 2005,** regarding subscriptions:

> Tobi, when you get a chance, can you check with Bill about what subscriptions he wanted ordered on behalf of digital services and who he asked. I guess we can probably try to obtain some comp copies of industry magazines.

[Drysdale Decl., Ex. B, Email Provided to Drysdale from Gazzola].

42.    Ms. McNichol wrote the following to Plaintiff, **on February 24, 2005,** to Plaintiff regarding subscriptions:

> Hey, Tobi. Just cleaning up my email and came across this one. Can you touch base with Bill for me on the attached? Thanks.

[Drysdale Decl., Ex. C, Email Provided to Drysdale from Gazzola].

43.    Melanie McNichol wrote the following to Plaintiff, **on February 17, 2005,**

regarding ads:

> Tobi . . . could [you] create the tabs/folders for Sunday ad, dates
> from 11-28-04 up to the present, we can put the fliers in the
> competitive area.

[Drysdale Decl., Ex. D, Email Provided to Drysdale from Gazzola].

44.    Melanie McNichol wrote the following to Plaintiff, **on March 2, 2005,**  regarding
ads:

> Hi, Tobi, just wanted to see if the files for the Sunday ads are
> ready.  I would like to get these filed.

[Drysdale Decl., Ex. E, Email Provided to Drysdale from Gazzola].

45.    David Troy wrote to Mr. Drysdale on **March 4, 2005:**

> Bill, following up to our conversation, I had given Tobi three X-13
> requests, two of which were urgent and had to ship today for
> Monday morning delivery, one was for corporate communications
> for the New York Yankees, one was for Wal-Mart for their April
> planogram set.  We needed to get a sample of each. . .to their
> product tester [].  This was coordinated with customer service and
> SCM to insure the order was released since A345's are allocated.
> All they were waiting for was the X-13.  I gave these to Tobi first
> thing this morning, 9:30, and explained it was critical that they
> ship today.  I asked that she walk them through for signatures and
> fax them to customer service right away.  I followed up on these
> my first opportunity this afternoon, and as we discovered, they
> were in your signature folder in the middle of a very large stack of
> papers.  Had I not gone looking for these, they most likely would
> not have gotten to customer service today, we would have missed
> our [sic] on your opportunity at Wal-Mart for new items in April.  I
> believe my verbal instructions were sufficient to convey the
> urgency of getting theses [sic] X-13s signed and over to customer
> service.

[Drysdale Decl., Ex. F, Email to Drysdale, dated March 4, 2005].

46.    Plaintiff "faintly" recalled some of these events.  [Tuttle Decl., Ex. C, White Dep.

Vol. II, 333:23-24; 335:18-20].

47.     Plaintiff admitted that managers did, at times, follow up with her.  [*Id.*, White Dep. Vol. II, 334:12-14; 335:21-24].

### (3)    Plaintiff's Six-Month Review on March 24, 2005.

48.     On March 24, 2005, Mr. Drysdale met with Plaintiff to provide a six-month update on Plaintiff's progress. [Tuttle Decl., Ex. C, White Dep. Vol. II, 287:9-13, 293:22-24].

49.     During this six-month review meeting, Mr. Drysdale discussed Plaintiff's areas of strengths and weaknesses and  how to help improve Plaintiff's performance.  [*Id.*, White Dep. Vol. II, 295:4-10, 14-19].

50.     Mr. Drysdale identified the following six items that needed improvement: (1) completion of assignment and projects; (2) follow-up to tasks and requests; (3) responsiveness to others; (4) sense of urgency as indicated by business; (5) communication; (6) taking initiative and ownership. [Tuttle Decl., Ex. F, Six-Month Review Memorandum, dated March 28, 2005 ("March 28[th] Memorandum")].

51.     Plaintiff did not respond to Mr. Drysdale's comments during the March 24th meeting. [Tuttle Decl., Ex. C, White Dep. Vol. II, 295:20-22].

### (4)    Mr. Drysdale's Request for An Electronic Copy of Plaintiff's April 4, 2005 Rebuttal.

52.     Plaintiff submitted a written rebuttal, dated April 4th, in response to Mr. Drysdale's March 28th Memorandum.  [Tuttle Decl., Ex. C, White Dep. Vol. II, 299:13-16; 299:22 to 300:4].

53.     Plaintiff left a hard copy of the April 4th rebuttal on his chair. [*Id.*, White Dep. Vol. II, 301:13-19; 317:20 to 318:6].

54.     When Mr. Drysdale requested an electronic copy of this rebuttal, Plaintiff responded: **"The copy you recieved [sic] is sufficient"**.   [*Id.*, White Dep. Vol. II, 316:10-13, 20-23; Drysdale Decl., Ex. G, Email Exchange, dated April 4, 2005 and April 7, 2005, Between Plaintiff and Mr. Drysdale ("April 4th-April 7th Email Exchange")].

55.     Mr. Drysdale asked for the rebuttal a second time explaining that he likes to "minimize paper" in his files and, again, Plaintiff refused Mr. Drysdale's request.  [*Id.*, Ex. C, White Dep. Vol. II, 316:24 to 317:9].

56.     Plaintiff agreed to provide Mr. Drysdale with a copy of the April 4th rebuttal on a disk. [Tuttle Decl., White Dep. Vol. II, 319:8-10].

57.     Plaintiff asked Mr. Drysdale for the paper copy of her own rebuttal response (which she had given him) so that she could re-type the memo during work hours.  [*Id.*, White Dep. Vol. II, 319:14-20].

58.     Mr. Drysdale and Ms. Giorlando then met with Plaintiff on April 11th to discuss her rebuttal.  [Drysdale Decl., ¶13].

59.     During this meeting, Mr. Drysdale expressed his surprise as to the tone of her rebuttal and that, contrary to her impressions, he thought they had had a productive six-month review meeting. [Tuttle Decl., Ex. C, White Dep. Vol. II, 313:3-13].

60.     Following this April 11th meeting, Mr. Drysdale prepared an April 12th memorandum which stated, in part:

> Unfortunately, your response to my six-month performance update memo requires the writing of this document to clarify several issues.  First, let me state that I was very surprised by the content and tone of your response.   Your written response was very different from your verbal responses and very different from the actual conversations we had during our meeting.  Not only is your written response inaccurate from the standpoint of content and tone, but also incorrect as to the facts of our meeting.

Sharon and I both felt that our meeting of 3/24/05 was very productive and cordial, from all three perspectives. We felt that together the three of us identified areas of performance that were satisfactory, identified areas in need of improvement, and we jointly clarified several misconceptions that you had regarding your job position and areas of responsibility. The tone of the actual meeting was mostly positive, and it was managed from the standpoint of improving your performance, and quite frankly, helping you to improve your professional skills and business related core competencies. In addition, we provided examples for every area of performance we discussed, both positive and negative. Lastly, we provided you every opportunity to ask questions and clarify any and all issues both related and non-related to the topics at hand.

[Tuttle Decl., Ex. G, Memorandum to Plaintiff from Drysdale, dated April 12, 2005 ("April 12[th] Memorandum")].

**(5)    Plaintiff's Refusal to Participate in Human Resources' Investigation of Her Allegations of "Discriminatory Practices".**

61.    During this same April 11th meeting, Mr. Drysdale and Ms. Giorlando asked Plaintiff about her general reference to "discriminatory practices" in her April 4th memorandum. [Tuttle Decl., Ex. C, White Dep. Vol. II, 320:7-12; Ex. H, Memorandum to Plaintiff from Sharon Giorlando, dated April 14, 2005 ("April 14th Memorandum")].

62.    Plaintiff refused to provide an explanation for her claim to Ms. Giorlando and Mr. Drysdale. [*Id.*, Ex. C, White Dep. Vol. II, 320:24 to 321:2; Ex. H, April 14th Memorandum].

**(6)    Plaintiff's Refusal to Participate in the PDPR Process.**

63.    In May 2005, FUSA commenced its formal Performance and Development Planning and Review ("PDPR") process for its employees. [Tuttle Decl., Ex. I, Giorlando Dep., 23:8-15; Giorlando Decl., ¶4].

64.     FUSA's PDPR process required an employee, based upon the division's goals, to complete his or her objectives for the year. [Tuttle Decl., Giorlando Dep., 23:8-15].

65.     The employee would then meet with his or her manager to review the plan and agree upon the upcoming year's objectives. [Id.]

66.     Once completed, the department manager sends the completed and signed copy of the PDPR to Human Resources.   [Tuttle Decl., Ex. I, Giorlando Dep., 24:19-24; 25:12-17; Giorlando Decl. ¶5].

67.     When Plaintiff joined the new Digital Devices Division, none of the employees, including Mr. Drysdale, had in place defined objectives for the new department because each employee had different responsibilities. [Tuttle Decl., Ex. D, Drysdale's Dep., 23:4-12].

68.     Mr. Drysdale told Plaintiff not to worry about her 2004 PDPR since she had the September 30th Memorandum outlining his expectations. [Tuttle Decl., Ex. C, White Dep. Vol. II, 326:8-20; 329:4-8; Ex. E, September 30th Memorandum].

69.     In mid-May 2005, Mr. Drysdale worked with Plaintiff to complete her objectives for her PDPR in the Digital Devices Division. [Id., Ex. C, White Dep. Vol. II, 347:3-18].

70.     Mr. Drysdale told Plaintiff that if any objective she previously provided was not appropriate, given the new division, then Plaintiff should "feel free to write a new or similar objective and provide results against the objective." [Id., White Dep. Vol. II, 351:9-18; 352:8-14; Ex. J, Email Exchange, dated May 16, 2005 Between Plaintiff and Drysdale ("May 16th Email Exchange")].

71.     Mr. Drysdale provided Plaintiff an opportunity to include additional information regarding her performance. [Tuttle Decl., White Dep. Vol. II, 351:14-18; 352:15-25].

72.     Mr. Drysdale used the same process for everyone else in marketing within the Digital Devices Division whether they had formal objectives or not. [*Id.*, Ex. J, May 16th Email Exchange].

73.     Mr. Drysdale met with Plaintiff on May 17, 2005 to review her PDPR. [Tuttle Decl., Ex. C, White Dep. Vol. II, 362:6-17].

74.     Mr. Drysdale asked Plaintiff to provide her comments to the PDPR by a date certain, May 24th at noon, so that he could submit the completed document to Human Resources. [Tuttle Decl., Ex. C, White Dep. Vol. II, 362:18 to 364:8;  Drysdale Decl., Ex. H, Email Exchange, dated May 25, 2005, between Plaintiff and Drysdale ("May 25th Email Exchange")].

75.     Mr. Drysdale requested that all his employees submit their PDPRs by the same due date. [Drysdale Decl., Ex. H, May 25th Email Exchange].

76.     All employees in the Digital Devices Department, except Plaintiff, submitted their PDPs. [*Id.*]

77.     Mr. Drysdale followed up with Plaintiff the next day (May 25, 2005) and offered to reserve a conference room, that day, to allow Plaintiff an opportunity to complete her comments to her PDPR. [Tuttle Decl., Ex. C, White Dep. Vol. II, 363:24 to 364:8; Drysdale Decl., Ex. H, May 25th Email Exchange].

78.     Mr. Drysdale told Plaintiff that he would instruct the rest of the department managers not to disturb her. [Drysdale Decl., Ex. H, May 25th Email Exchange].

79.     Mr. Drysdale offered to extend the deadline until the end of the day. [Drysdale Decl., Ex. H, May 25th Email Exchange].

80.     Plaintiff wrote that she would provide a detailed summary at a later date. [*Id.*, Ex. K, White Dep. (Second Lawsuit), 66:3-10].

(6)     **Plaintiff is Terminated For Insubordination.**

81.     Mr. Drysdale and Ms. Giorlando met with Plaintiff on June 3, 2005 and terminated her for insubordination.  [Tuttle Decl., Ex. C, White Dep., Vol. II, 373:19 to 374:15].


(7)     **Plaintiff Attributes No Retaliatory Actions or Comments to Her Manager, Human Resources or FUSA's Legal Department.**

82.     Mr. Drysdale did not say or do anything that caused Plaintiff to conclude that she was terminated because of her First Lawsuit.   [Tuttle Decl., Ex. K, White Dep. (Second Lawsuit), 63:18-23].

83.     Ms. Giorlando did not say or do anything that caused Plaintiff to conclude that she was terminated because of her First Lawsuit.  *[Id.*, White Dep. (Second Lawsuit), 65:7-10].

84.     Jonathan File, Esq., FUSA's General Counsel, did not say or do anything that caused Plaintiff to conclude that she was terminated because of her First Lawsuit.  *[Id.*, White Dep. (Second Lawsuit), 65:11-15].


*The following facts are not in dispute because they were litigated and decided in the case White v. Fuji Photo Film U.S.A., Inc., 434 F. Supp. 2d 144 (S.D.N.Y. 2006).*

C.     **FUSA Broadcasts Effective Anti-Discrimination Policies.**

85.     FUSA maintained and disseminated effective anti-discrimination policies to its employees, including Plaintiff.  [Tuttle Decl., Ex. C, White Dep. Vol. II, 251:5-14].

86.     These policies were contained in FUSA's employee handbook.  *[Id.*, White Dep. Vol. II, 375:22 to 376:3].

87.    Plaintiff signed a form acknowledging receipt of FUSA's employee handbook and was aware of FUSA's reporting complaint procedure.  [*Id.*, White Dep. Vol. II, 376:4-6, 12-18; 379:9-12].

88.    Despite these available resources, Plaintiff chose to tape-record conversations with her managers and human resources managers, without their knowledge, because she wanted to use these secret recordings as "evidence" in her first and second lawsuit.  [*Id.*, White Dep. Vol. II, 382:9-12; 383:19-21; 383:25 to 384:7].

89.    Plaintiff admitted that she could not recall any "evidence" of wrongdoing by FUSA on these tapes.  [*Id.*, White Dep. Vol. II, 384:3-7].

*The following facts are not in dispute based on the record evidence.*

**D.    FUSA's Policies Allows For Termination Due to Insubordination.**

90.    FUSA's Employee Handbook includes "Fujifilm Business Standards", which states, in part, that FUSA is committed to providing an atmosphere conducive to good working relations. [Giorlando Decl., ¶8; Ex. A, FujiFilm Business Standards].

91.    FUSA's Business Standards states, in part, that grounds for dismissal may include serious infractions, including, but not limited to insubordination. [Giorlando Decl. ¶¶8-9].

**DRINKER BIDDLE & REATH LLP**
Attorneys for Defendant
FUJIFILM U.S.A., Inc.

By: _____ s/ Helen E. Tuttle _____
        Helen E. Tuttle
        John A. Ridley

Dated: October 2, 2009